CIVIL ACTION NO. 2012-212 - WOB-JGW

JILL VAN WINKLE                                         PLAINTIFF

VS.

HM INSURANCE GROUP, INC., ET AL.                       DEFENDANTS

### MEMORANDUM OPINION AND ORDER

This is an employment discrimination case involving allegations of sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344. Specifically, Plaintiff Jill Van Winkle alleges that her employer violated her civil rights by terminating her on January 26, 2012.

Van Winkle initially brought this action against HM Insurance Group, Inc. ("HMIG"). The Court granted her leave to amend her complaint to add HM Life Insurance Company, a wholly owned subsidiary of HMIG, as a defendant after the Court determined that these two entities should be treated as joint employers for purposes of her claims. [1] *See* Doc. 78, Order.

Plaintiff also alleged state law claims for intentional infliction of emotional distress and breach of the duty of good faith and fair dealing, but she has since conceded these claims. *See* Doc. 63, Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., at 1 n.1.

---

[1] Hereinafter, Defendants are jointly referred to as "the Company."

Defendant HMIG brings a counterclaim alleging that following her termination, Van Winkle misappropriated trade secrets and other confidential information in violation of the Kentucky Uniform Trade Secrets Act, Ky. Rev. Stat. §§ 365.880–.890. HMIG also counterclaimed for injunctive relief to prevent any threatened misappropriation. These counterclaims arise from Plaintiff's alleged violations of the Company's Information Use Management and Disclosure Policy, which defines confidential and proprietary information and outlines the limited circumstances under which employees may use such information. Doc. 24-2, Information Use Management & Disclosure Policy.

This matter is before the Court on Plaintiff's motion for summary judgment on Defendant HMIG's counterclaims (Doc. 41) and Defendant HMIG's cross-motion for summary judgment[2] on all of Van Winkle's claims and its counterclaims (Doc. 44). The Court heard oral argument on September 23, 2014, and took these motions under advisement. After further study, the Court now issues the following Memorandum Opinion and Order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Plaintiff's Hiring and Job Responsibilities

The Company, which provides services to insurance carriers and providers, hired Van Winkle as Regional Sales Director of its Cincinnati office on August 6, 2007. Doc. 56-1, Van Winkle Dep. Ex.,

---

[2] Although Defendant HM Life Insurance did not file a separate motion for summary judgment, the Court concludes that the issues raised by HMIG are applicable to both defendants and thus treats HMIG's motion as brought on behalf of both companies.

at 14-15.[3]  Van Winkle had years of insurance industry sales experience, including significant experience with stop-loss insurance, one of the Company's key products.  Doc. 44-4, Van Winkle Personnel File, at 4-5.  At her hiring, the Company considered her a "strong" candidate and a "good fit all around."  *Id.* at 6.

The Regional Sales Director direction position -- a senior-level sales position -- required Van Winkle to maintain existing business, generate new business revenue, and grow a profitable book of business in the group insurance market.  Doc. 44-7, Job Descriptions, at 1. The position also required Van Winkle to work with management to develop strategies for complex and unusual sales opportunities and to implement new techniques, products, services, or policies to improve the company's overall profitability.  *Id.*  Van Winkle was expected to work through distribution channels of existing and new producers, such as brokers and third-party administrators ("TPAs").  *Id.*  Her job description stated that the Senior Vice President of Sales would define her sales territory, which would vary.  *Id.*  In addition, Van Winkle supervised two employees in Cincinnati, and, beginning in 2009, three people in Cleveland.  Doc. 56, Van Winkle Dep., at 49-50.

**B. Van Winkle's Job Performance**

Van Winkle admits that during her four years of employment with the Company, she never met her annual sales goal.  Doc. 56, Van Winkle Dep., at 110.

---

[3] All citations herein refer to Volume I of Van Winkle's deposition.

During Van Winkle's first performance appraisal, in August 2008, she earned a merit raise and overall performance rating of "3" on a four-point scale -- meaning "solid performance." Doc. 62, Wilden Dep., at 31-32; Doc 62-1, Appraisal Form, at 1.

A month later, the Company designated a number of "red" TPAs across the country as part of a corporate initiative to focus on those organizations' profitability. Doc. 62, Wilden Dep., at 71. United Medical Resources ("UMR"), which provided about $3 million in revenue -- approximately fifty percent of the Cincinnati office's book of business -- received the designation. *Id.* at 71-72, 77-78; Doc. 56, Van Winkle Dep., at 52-53. The parties dispute whether UMR's red TPA designation barred Van Winkle from quoting business to UMR. *Compare* Doc. 44-4, Van Winkle Personnel File, at 15, *with* Doc. 62, Wilden Dep., at 72-75.[4]

Shortly thereafter, around October 3, 2008, Wilden assigned Van Winkle the sales territories previously managed by the Company's Cleveland office, which was closing. Doc. 44-4, Van Winkle Personnel File, at 26. The Cleveland market significantly expanded Van Winkle's book of business; Wilden testified that the market was generating $6 to $11 million in new business prior to Van Winkle taking over. Doc. 62, Wilden Dep., at 78. Because Van Winkle's employment record included significant Cleveland market experience, Wilden believed this

---

[4] Van Winkle asserts she was not permitted to quote business, while Wilden testified that Van Winkle was instructed to correct the UMR book of business through rate increases. *See* Doc. 44-4, Van Winkle Personnel File, at 15. Wilden denied that the Company instructed Van Winkle to terminate the UMR business. Doc. 62, Wilden Dep., at 74-75.

transition would be seamless. *See* Doc. 44-4, Van Winkle Personnel File, at 4-5; Doc. 62, Wilden Dep., at 102.

In April 2009, Van Winkle received her second performance appraisal, again earning a "3" rating on a four-point scale and a merit raise, despite not meeting her year 2008 sales goal.[5] Doc. 62-1, Personnel Action Form, at 2; Doc. 44-4, Van Winkle Personnel File, at 25.

## C. 2010 Review and Performance Improvement Plan

On April 9, 2010, Van Winkle received her third performance review, earning a "2" rating on a four-point scale, indicating that she "meets some but not all goals." Doc. 56-1, Van Winkle Dep. Ex., at 20-30.[6] Again, Van Winkle failed to meet her annual sales goal, producing only $1,322,003 of her $3,920,000 target. During the review, Van Winkle and Wilden discussed that her results were not meeting expectations. Wilden also told Van Winkle that she would receive a new sales goal and a performance improvement plan ("PIP"). *Id*. at 20.

On June 28, 2010, Van Winkle received the PIP. Doc. 62, Wilden Dep., at 38-39; Doc. 62-1, Wilden Dep. Ex., at 4-5. Wilden issued the plan after consulting with human resources staff and Senior Vice

---

[5] Van Winkle produced $2,250,664 against a goal of $3 million. Doc. 44-4, Van Winkle Personnel File, at 25.

[6] Plaintiff challenged her "persistency" score, a sub-component of her review score measuring the difference between a beginning book of business and ending book of business. Doc. 56, Van Winkle Dep., at 60-62. Wilden reviewed her challenge and on May 3, 2010, sent Van Winkle a revised review raising the persistency score from a "2" to a "3". Her overall review score remained a "2." Doc. 56-1, Van Winkle Dep. Ex., at 21.

President of Sales, Mark Lancellotti.  Doc. 62, Wilden Dep., at 19, 39; Doc. 53, Lancellotti Dep., at 22.

Attempting to identify the reasons for Van Winkle's lack of success in achieving her sales goals, Wilden consulted with Director of Underwriting John Bankoske about Van Winkle's discussions with Underwriting.  Wilden determined that Van Winkle's failure to "push" cases to supervising underwriters may have contributed to her lack of success.  Doc. 62, Wilden Dep., at 23-24; Doc. 51, Bankoske Dep., at 26-27.  Because line underwriters have limited authority, a salesperson may need to elevate cases outside the underwriter's permitted risk-taking to close a deal.  Doc. 62, Wilden Dep. at 29. Wilden testified that the Company "constantly communicated" to Van Winkle the importance of pushing cases.  *Id*.

Van Winkle's PIP identified several action steps, including pushing selective cases to the underwriting leadership to increase her new business close ratio, meeting with five brokers or TPAs each month, and making at least two visits to the home office before the end of 2010.  Doc. 62-1, Wilden Dep. Ex., at 4-6.  Required follow-up included monthly calls with Wilden and biweekly calls to Bankoske. *Id*.  The PIP also established two performance expectations: achieving $4 million in new stop-loss premiums by December 31, 2010 and securing $3 million in new stop-loss business with January 1, 2011 effective dates.  *Id*.  The PIP required Van Winkle to meet at least one of the two goals by January 15, 2011 to avoid further discipline.  *Id*.

Aware of the PIP, Bankoske contacted Van Winkle and told her to escalate cases to underwriting leadership, offering to assist her as he could.  Doc. 44-8, Bankoske Dep., at 28.

On November 18, 2010, two months prior to the January 15, 2011 deadline for achieving the PIP goals, Wilden issued a final written warning to Van Winkle after consulting with Human Resources.  Doc. 44-4, Van Winkle Personnel File, at 19-23; Doc. 62, Wilden Dep., at 92; Doc. 54, Strilka Dep., at 75, 80-81.  The warning stated that Van Winkle was not following through with the PIP action steps and noted that, based on her performance to date, Van Winkle was not on track to meet either of the PIP sales goals.  Doc. 44-4, Van Winkle Personnel File, at 19-23.  The warning accelerated the deadline for achieving the PIP goals by two weeks and prescribed an evaluation date of January 7, 2011.[7]  *Id*.

On December 17, 2010, Van Winkle emailed Human Resources Manager Mary Jo Totten, Director of Human Resources Lori Strilka, Wilden, and Lancellotti regarding her November 18, 2010 disciplinary action form, questioning the "intent of the action."[8]  Doc. 44-4, Van Winkle

---

[7] Although Van Winkle questioned the accelerated deadline, the change in deadline was irrelevant to her ability to achieve the first PIP goal: selling $4 million in new business from June 28, 2010 to December 31, 2010. Regardless of the deadline, Van Winkle's sales through December 31, 2010 would be known on January 1, 2011. The accelerated deadline could have affected Van Winkle's ability to meet the second goal if she were permitted to sell policies retroactive to January 1, 2011 during the first two weeks of January. Because Van Winkle met this goal by the accelerated deadline, however, the acceleration is not material.

[8] Although Van Winkle questioned the "intent of the action," she did not claim the intent was related to discrimination on the basis of sex or any other

-7-

Personnel File, at 14. Van Winkle expressed surprise at the final warning, as the PIP's expected completion date was still two months away. *Id.* In addition to outlining her efforts to comply with the PIP action steps, Van Winkle stated that she was on track to meet the $3 million new stop-loss business goal but would not meet the $4 million new premiums goal. *Id.* Van Winkle also raised the issue of the loss of the UMR business, stating that Wilden had explained during her 2009 review that it would take at least twenty-four months to turn around that book of business. *Id.* at 15.

Although Van Winkle did meet the PIP goal of writing $3 million in new business with January 1, 2011 effective dates, she fell well short of her annual goal.[9] Doc. 62, Wilden Dep., at 18. Still, the Company felt Van Winkle demonstrated sufficient promise to continue her employment. *Id.* at 89.

**D. 2011 Performance and Change in Position**

In April 2011, Wilden restructured the Cincinnati office. He shifted Van Winkle from Regional Sales Director to Sales Consultant (a change that did not affect Van Winkle's base salary), and appointed Michael Herger (formerly the Cleveland office's Regional Sales Director) as the new Regional Sales Director. *Id.* at 99-101. Wilden testified that he made the changes to remedy the Cincinnati office's consistent underperformance under Van Winkle's leadership. *Id. at*

---

protected category. There is also no evidence Van Winkle ever complained of perceived discrimination.

[9] Van Winkle produced $1,672,804 against a goal of $5.8 million in 2010.

102-08.  Also, Wilden believed the change would help Van Winkle to succeed by allowing her to focus exclusively on sales.  *Id*. at 108.

Wilden divided the Cleveland and Cincinnati markets between Van Winkle and Herger.  Doc. 44-4, Van Winkle Personnel File, at 8.  Van Winkle received all of her original Cincinnati market accounts except Wells Fargo, plus all of the TPAs gained through the Company's recent acquisition of Mutual of Omaha and two high-visibility TPAs that Herger had formerly served.  *Id*.  Further, the Company assured Van Winkle that all sales related to proposals submitted before the official transition would be counted as part of her book of business. *Id*.  Wilden adjusted the sales goals for both Van Winkle and Herger, based on the division of business.  Doc. 44-4, Van Winkle Personnel File, at 7.

Throughout 2011, Van Winkle continued to struggle to meet her sales goal.  By October, Van Winkle had sold only $850,000 –– less than one-fifth of her annual goal.  Doc. 44-4, Van Winkle Personnel File, at 12.

On October 5, 2011, at Wilden's request, Herger emailed Van Winkle to set up a production review meeting.  *Id.*; Doc. 52, Herger Dep., at 9-11.  Herger's email stated that it was apparent Van Winkle would need a "big end of the year push" to achieve her yearly sales goals.  Doc. 44-4, Van Winkle Personnel File, at 12.  Herger requested to meet with Van Winkle during his next trip to Cincinnati to review her assignments and identify producers and resources that would help her succeed.  *Id*.  Herger's email reminded Van Winkle that "failure to

meet the 2011 production goal can have a significant impact on [her] future employment with HMIG." *Id.*

Herger then met with Van Winkle and discussed approaches to closing outstanding proposals, emphasizing that if Van Winkle did not meet her production goal by January 1, she would most likely be terminated.[10] Doc. 52, Herger Dep., at 11.

On October 8, 2011 (after Herger's email but before her in-person meeting with him), Van Winkle filed an EEOC charge against the Company claiming that it discriminated against her on the basis of sex and age based on her demotion. Doc. 44-13, EEOC File, 15-16. The EEOC issued a "no probable cause" determination. *Id.* at 9.

**E. Termination**

After Van Winkle failed to meet her January 1, 2012 sales goal, Wilden formally recommended on January 26, 2012, that the Company terminate Van Winkle's employment based on her repeatedly unacceptable sales results. Doc. 44-4, Van Winkle Personnel File, at 24-25.

Upon notifying Van Winkle of her termination, the Company instructed Van Winkle to pack up her office by the end of the week. Doc. 56, Van Winkle Dep., at 186. Van Winkle packed boxes with documents from her office and put them in her home garage, which she normally keeps locked. *Id.* at 187-91. Van Winkle testified that she did not look at the boxes' contents again after placing them in her garage. *Id.* at 188-90.

---

[10] It is unclear when this meeting occurred, but it was likely on October 12 or October 13, 2011, consistent with the timeframe Herger proposed in his October 5, 2011 email. *See* Doc. 56-1, Van Winkle Dep. Ex., at 44.

Three months later, on April 18, 2012, Van Winkle filed a second EEOC charge against the Company for gender and age discrimination and retaliation based upon her termination. Doc. 44-13, EEOC Charge, at 6-8. Van Winkle requested a right-to-sue letter, which the EEOC issued on August 29, 2012. *Id.* at 1. On October 17, 2012, Van Winkle filed the instant action. Doc. 1, Complaint. Van Winkle moved for summary judgment on April 17, 2014. The Company filed its cross-motion for summary judgment on April 23, 2014.

## II. ANALYSIS

### A. Summary Judgment

Summary judgment is appropriate where the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A court "must consider 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Rouster v. Cnty. of Sagniaw*, 749 F.3d 437, 446 (6th Cir. 2014)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). In determining whether there is a genuine dispute as to a material fact, "we interpret the facts and draw all reasonable inferences therefrom in favor of the nonmoving party." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

But "[i]f the evidence is merely colorable, . . . or is not significantly probative, . . . the court may grant judgment." *Anderson*, 477 U.S. at 249–50.

## B. Plaintiff's Gender Discrimination Claim

Claims of gender discrimination in violation of Title VII that rely on circumstantial evidence are evaluated using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 589 (6th Cir. 2014).

Van Winkle has the burden of stating a prima facie case of gender discrimination by establishing by a preponderance of the evidence, that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position she held; and (4) she was replaced by someone outside of her protected class or treated differently from similarly situated, non-protected employees.[11] *Id.* If she establishes these elements, the burden shifts to the employer to present a legitimate, nondiscriminatory reason for the adverse action. *See Griffin v. Finkbeiner,* 689 F.3d 584, 592 (6th Cir. 2012). The burden of production then reverts to the plaintiff to show by preponderance of the evidence that the employer's proffered nondiscriminatory reason was pretext. *Id.*

---

[11] Title VII and the Kentucky Civil Rights Act are interpreted consistently. *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 793 (6th Cir. 2000) (citing *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814 (Ky. 1992)).

### 1. Prima Facie Case

The Company concedes, for purposes of summary judgment, that Van Winkle has established the first three elements of a prima facie case.[12] Regarding the fourth element, Van Winkle asserts that the Company treated similarly situated male employees differently and that she was replaced by Herger, a male employee.

#### a. The Company's Treatment of Similarly Situated Male Employees

A valid "comparable" must be similarly situated in all relevant respects. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352–53 (6th Cir. 1998) (explaining how *Pierce v. Commonwealth Life Insurance Co.*, 40 F.3d 796 (6th Cir. 1994), clarified the standard set forth in *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992)). A plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment . . . to be considered 'similarly-situated;'" rather the emphasis is on the *relevant* aspects. *Id.* at 352. Further, Sixth Circuit precedent cautions against applying this standard too narrowly. *See, e.g., Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (emphasizing that an exact correlation is not necessary).

Factors to consider include whether the plaintiff and the purported comparables have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct

---

[12] Because the Company conceded in its motion for summary judgment that Van Winkle was demoted and that her demotion constituted an adverse action, *see* Doc. 44-1, at 23–24, the Court disregards the Company's later assertion in its Reply, *see* Doc. 65, at 5, that the change in Van Winkle's position did not constitute a demotion or an adverse action.

without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Ercegovich*, 154 F.3d at 352 (citing *Mitchell*, 964 F.2d at 583).

Van Winkle identified Dallas Regional Sales Director Albert Lucio and Washington, D.C. Regional Sales Director Kevin Leary as similarly situated male employees who received more favorable treatment. However, neither of these individuals are valid comparables. The critical distinction between Van Winkle and these individuals lies in the severity and duration of their underperformance of sales goals.

Although Lucio, like Van Winkle, missed his annual sales goals over multiple years, he missed only two years consecutively -- not four years. Likewise, it is not disputed that during the year prior and year following that two-year period of underperformance, Lucio exceeded his sales goals. Moreover, Lucio's performance during that time was supervised by a different manager. *See* Doc. 65-2, Personnel Records, at 1 (noting Eugene Susi as supervisor for 2002-2003).

The third year in which Lucio failed to meet his goal -- 2009 -- came after several years of meeting his annual sales targets.[13] *See* Doc. 53-1, Lancellotti Dep. Ex., at 54-61 (reviewing Lucio's 2009 performance). Van Winkle, in contrast, never established a track record of meeting her sales goals.

---

[13] Plaintiff notes that Defendants failed to produce a complete performance evaluation for Lucio covering the 2008 sales year. The document produced, Doc. 63-1, Lucio Review, at 35-36, does not state, as Plaintiff asserts, that Lucio failed to meet his sales goals during 2008. Instead, the document includes comments by Lucio about what it will take to be successful in 2009. Doc. 63-1, Lucio Review, at 36. As such, the Court will not speculate as to Lucio's 2008 results.

Plaintiff also notes that Lucio received a "3" performance rating in 2009, despite not meeting his sales goal. Doc. 53-1, Lancellotti Dep. Ex., at 54-62. However, Plaintiff disregards that she also received ratings of "3" during her first two reviews, despite not meeting her sales goals in those years. *See* Doc 62-1, Appraisal Form, at 1 (2007 sales year); Doc. 44-4, Van Winkle Personnel File, at 25 (2008 sales year). Also, consistent with Defendants' treatment of Lucio, Plaintiff was not put on a performance improvement plan after two consecutive years of failing to achieve her sales goals. Instead, the Company did not initiate performance improvement measures until after Van Winkle's third consecutive year of missed targets. *See* Doc. 56-1, Van Winkle Dep. Ex., at 20-30. Van Winkle has not presented evidence of a comparable male salesperson with three consecutive years of missed goals, and thus she cannot show that her placement on a PIP after a third year of missed goals constituted differential treatment based on her gender.

Regarding Leary, the record reflects that he failed to meet one of two sales goals for the 2008 sales year. Doc. 53-1, Lancellotti Dep. Ex., at 50. Plaintiff emphasizes Leary's severe underperformance in his "worksite" goal; Leary produced only $95,000 against a goal of $1 million. *Id.* But Plaintiff ignores that during the same year, Leary far exceeded his stop-loss goal -- selling $5.85 million against a goal of $3.5 million. *See id.* (noting that Leary sold 165% of his stop-loss goal for 2008). Combined, Leary sold $5.95 million against

a goal of $4.5 million. Thus, Leary -- having failed to achieve one component of one year's sales goal -- is not a valid comparator.

Finally, Van Winkle has not shown that the Dallas and Washington, D.C. markets are comparable to the Cincinnati and Cleveland territories she covered. Because Van Winkle has failed to identify any valid comparators, the Court finds no evidence that the Company treated similarly situated male employees differently.

### b. Replacement by Herger

A person is replaced "only when another employee is hired or reassigned to perform the plaintiff's duties." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). Conversely, a person is not replaced if, following a reduction in force or other reorganization, "another employee is assigned to perform the plaintiff's duties in addition to other duties or when work is redistributed among other existing employees already performing related work." *Id*.

It is undisputed that Herger is the only employee who assumed any of Van Winkle's duties following her termination from employment. *See* Doc. 63-1, Def.'s Ans. to Pl. Int., at 21; Doc. 62, Wilden Dep., at 121. The Company contends that it never filled Van Winkle's sales consultant position and argues that the Court therefore should analyze the shift of Van Winkle's responsibilities to Herger in the context of a reduction in force. Under that theory, it asserts, Herger did not replace Van Winkle by assuming her duties after she was terminated from employment.

Plaintiff asserts, however, that determining whether Herger replaced her requires analysis of both her demotion and termination. She contends that Herger replaced her in two stages: first, by assuming her management responsibilities, job title, and some of her sales territories in May 2011 after her demotion; and second, by assuming her remaining duties after the Company terminated her employment.

The Court need not decide whether this sequence of events constituted a replacement because Plaintiff's gender discrimination claim fails for other reasons. But for purposes of summary judgment, the Court will draw all inferences in Plaintiff's favor and assume that she has satisfied the fourth element of her prima facie case.

**2. Analysis of the Company's Proffered Reason for Terminating Van Winkle's Employment**

The Company asserts that it terminated Van Winkle because she failed to meet her sales goals for four consecutive years –– a fact Van Winkle admits. *See* Doc. 62, Wilden Dep., at 121; Doc. 56, Van Winkle Dep., at 110.

To establish pretext, Van Winkle must show: (1) the employer's stated reason for the adverse action has no basis in fact; (2) the stated reason is insufficient to motivate the employer's decision; or (3) the stated reason did not actually motivate the employer's decision. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009).

Plaintiff advances three arguments to establish pretext. First, she argues that the Company treated similarly situated men more favorably. Second, she contends that her direct supervisor, Wilden, was a bad actor who did not help her succeed. Finally, Van Winkle points to a sexist statement by Lancellotti as evidence of discriminatory animus.

### a. Treatment of Similarly Situated Male Employees

For the reasons described in section II.B.1.a, the Court finds no evidence that similarly situated males received more favorable treatment and thus rejects Plaintiff's first pretext theory.

### b. Bad Actor Analysis

Van Winkle next argues that her production goals and sales territory assignments were subjective and set by a bad actor, Wilden.

Initially, the same actor inference undermines Van Winkle's theory. The same actor inference allows a court "to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 572 (6th Cir. 2003) (en banc) (quoting *Buhrmaster v. Overnite Trans. Co.*, 61 F.3d 461 (6th Cir. 1995)). Here, Wilden, in consultation with his direct supervisor and Human Resources, hired, demoted, and terminated Van Winkle. *See* Doc. 64-1, Personnel Records, at 7 (hiring); Doc. 62, Wilden Dep., at 106-08 (demotion); *id.* at 13

(firing). Thus, the Court infers that he acted without a discriminatory purpose.[14]

Van Winkle argues that her performance goals and evaluations were subjective, which courts in our circuit have found to provide "ready mechanisms for discrimination." *Grano v. Dep't of Dev. of City of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983). Although the Court acknowledges the force of this point, subjective goals and evaluations are not per se illegal. *See id.* The ultimate question is whether subjective criteria were used to "disguise" gender discrimination. *Id.* Plaintiff has not pointed the Court to evidence that would allow a reasonable jury to answer that question affirmatively.

First, Plaintiff argues that the Company failed to consider the impact of major producer UMR's designation as a red TPA in setting her sales goals. At the summary judgment stage, the Court is required to accept Van Winkle's testimony that the UMR designation barred her from quoting business to UMR -- a loss of approximately $3 million in sales. But these facts still do not support Plaintiff's theory because only three months following the purported loss of UMR, Van Winkle gained the Cleveland office territories -- a $12-15 million book of business. Doc. 62, Wilden Dep., at 101. Thus, the dispute over the UMR designation is not material.

---

[14] Although Sixth Circuit precedent does not require the Court to draw this inference, given the dearth of other evidence of discriminatory motive in this case, the Court finds the inference appropriate here. *See Wexler*, 317 F. 3d at 573-74 (clarifying the same actor inference).

Second, Van Winkle asserts that she questioned the goals set for her related to TPAs acquired by the Company from Mutual of Omaha and never received a suitable explanation. Doc. 56, Van Winkle Dep., at 79-83. She also asserts that she was required to sign off on her goals despite not agreeing with the Omaha TPAs subgoal. *Id.* But Plaintiff's testimony was not that she believed the goal set for her was unachievable or that she was being set up to fail; Plaintiff testified that she "asked for an explanation" of the Omaha sales goal, had concerns about potential production from one of the TPAs (MedBen), and didn't "agree" with the goal. *Id.* at 83. Moreover, Van Winkle's questioning of the Omaha goals came in May 2011, after nearly four years of employment. The record contains no evidence of Van Winkle questioning her sales goals prior to this point. Nor does it contain evidence that in evaluating male employees, the Company weighted sales performance goals any differently than for Plaintiff. *Compare, e.g.*, Doc. 53-1, Herger Performance Appraisal for Sales Year 2009, at 35-41 (weighting goals as follows: new business goal (50%); persistency (20%), maintain profitable book of business (15%), management responsibilities (15%)); Doc. 53-1, Leary Performance Appraisal for Sales Year 2009, at 44-48 (same); *and* Doc. 53-1, Lucio Performance Appraisal for Sales Year 2009, at 56-60 (same), *with* Doc. 53-1, Van Winkle Performance Appraisal for Sales Year 2009, at 62-64, 66-69 (weighting goals as follows: new business goal (50%); persistency (20%), maintain profitable book of business (15%), management responsibilities (15%)).

Next, Van Winkle asserts that the Company favored Herger by assigning him the Wells Fargo account when the territories she had covered as Regional Sales Director were divided between her and Herger. But Van Winkle admits that both she and Herger had good relationships with contacts at Wells Fargo. Doc. 56, Van Winkle Dep., at 85-86. Moreover, the record reflects that the Wells Fargo account in the Cincinnati territory did not generate any business when Van Winkle managed it and has not fared better under Herger. Doc. 62, Wilden Dep., at 105. Thus, no reasonable jury could find that the Wells Fargo assignment materially affected Van Winkle's ability to achieve her goals.

Finally, Van Winkle alleges that Wilden told her that the decision to demote her and name Herger Regional Sales Director for the Cincinnati/Cleveland office was motived by a need to "take care of Mike [Herger]." Doc. 56, Van Winkle Dep., at 116. Based on the lack of other evidence from which to infer that Wilden discriminated against Van Winkle based upon her gender, the Court finds that this purported statement is not sufficient to raise a triable issue of fact.

Thus, the Court finds no triable issue as to whether Wilden used Plaintiff's goals and sales territory assignments to facilitate discrimination.

### c. Lancellotti Remark

Van Winkle also alleges that a statement by Lancellotti during a September 2011 sales meeting demonstrates the Company's discriminatory

animus toward women. Lancellotti admits that he "said something to the effect that we had a number of high performers in the room some of which were even women." Doc. 53, Lancellotti Dep. at 19. Lancellotti testified that he immediately apologized for his statement. *Id.*

An isolated discriminatory remark can be relevant to identifying discriminatory animus, depending on the speaker's role in the personnel decision and the substance of the remark. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-55 (6th Cir. 1998). Given the nature of this incident, the lack of any other evidence suggesting that the Company harbored animus toward women, and Lancellotti's limited role in personnel decisions affecting Van Winkle, the Court does not find that this remark supports an inference of discriminatory motive.

Because Van Winkle has failed to raise a triable issue as to pretext, the Court grants summary judgment to Defendants on Van Winkle's gender discrimination claim.

## C. Plaintiff's Retaliation Claim

Title VII retaliation claims supported by circumstantial evidence are also examined using the *McDonnell Douglas-Burdine* burden-shifting framework. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013) (citing *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010)). To assert a prima facie case of retaliation, Van Winkle must establish (1) she engaged in protected activity; (2) the exercise of her protected rights was known to the defendant; (3) she experienced an adverse employment action; and (4) there was a causal

connection between her protected activity and the adverse employment action. *Id.* Although Van Winkle establishes the first three elements of a prima facie case through her October 8, 2011 EEOC charge alleging gender and age discrimination and her termination on January 26, 2012, she has failed to show the required causal connection.

A plaintiff establishes a causal connection by proffering "evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Id.* at 675 (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009)). Van Winkle seeks to establish causation through temporal proximity — evidence that the Company terminated her less than four months after she filed her first EEOC charge.

In most cases, temporal proximity alone is insufficient evidence to establish a causal connection; its significance depends on the context. *See id.* If an adverse action occurs "very close in time" after an employer learns of an employee's protected activity, temporal proximity may be sufficient. *Id.* (quoting *Mickey Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). Conversely, where "some time elapses" between an employer learning of the protected activity and the adverse action, the employee must "couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* (quoting *Zeidler*, 516 F. 3d at 525).

Although the Sixth Circuit has not specifically defined "very close in time," the lack of a bright line rule is inapposite in this case. When an employer "'proceed[s] along lines previously

contemplated,'" courts "must not take the temporal proximity of the adverse employment action as evidence of causation." *Montell v. Diversified Clinical Servs.*, 757 F.3d 497, 507 (6th Cir. 2014) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam)).

There is no evidence that the Company deviated from its previously contemplated disciplinary timeline after it learned that Van Winkle had filed an EEOC charge. On October 5, 2011 -- three days before Van Winkle filed the charge -- Herger sent Van Winkle an email noting that her 2011 production was not on track to meet her annual goal and that failure to meet that goal could jeopardize her employment. *See* Doc. 56-1, Van Winkle Dep. Ex., at 44.

Herger's email also requested an in-person meeting with Van Winkle to discuss her performance and assess how she could meet her goal in time. *Id.* When the two met, Herger again told Van Winkle that failure to meet her production goal by January 1, 2012, would most likely lead to termination. Doc. 52, Herger Dep., at 11. Consistent with those warnings, the Company terminated Van Winkle after she failed to meet her January 1, 2012 goal.

Thus, although Van Winkle's termination did follow her EEOC charge, because her employer proceeded according to previously contemplated lines, temporal proximity is not sufficient to establish causation. Therefore, the Defendants are entitled to summary judgment on Van Winkle's retaliation claim.

**D. Defendant's Counterclaims**

To state a claim of trade secrets misappropriation under Kentucky law, a plaintiff must prove that the defendant took information that constituted trade secret and that the defendant misappropriated that trade secret information. *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 890 (E.D. Ky. 2003). Kentucky law defines "trade secret" as information that derives independent economic value, actual or potential, from not being generally known or readily ascertainable to other persons who can obtain economic value from its disclosure or use, and is subject to reasonable efforts to maintain its secrecy. Ky. Rev. Stat. § 365.880(4). "To prove misappropriation, Plaintiffs must show that the trade secret was acquired by improper means, was disclosed improperly, or was used by someone without proper consent." *BDT Prods.*, 274 F. Supp. 2d at 890 (citing Ky. Rev. Stat. § 365.880).

Van Winkle admits taking four boxes of documents from her office and storing them in her garage following her termination. *See* Doc. 56-1, Van Winkle Dep., at 173-75, 187. These boxes contained documents stamped "confidential" and "proprietary." *Id.* at 172-73. Wilden, who reviewed the boxes' contents, testified they contained, among other things, "proposals and attached documentation between Jill and the underwriter that laid out how an underwriter arrived at pricing," "confidential HIPAA information," and "reports by account" that included confidential pricing information that would be of great value to a competitor. Doc. 62, Wilden Dep. at 129-31.

Regardless of whether these documents contained trade secrets, Defendants cannot establish that Van Winkle misappropriated them. First, Van Winkle did not acquire the information by improper means, given her testimony that she took the boxes in response to the Company's instruction to clean out her office upon her termination. Doc. 56, Van Winkle Dep. at 186.

Second, there is no evidence that Van Winkle improperly disclosed the information. Although Van Winkle was subject to an Information Use Management and Disclosure Policy, which required her to protect and not disclose confidential information during and following her employment, there is no evidence that she did otherwise. Instead, Van Winkle testified, without contradiction, that the documents remained locked in her home garage at all times. Doc 56, Van Winkle Dep. at 187-90.

Third, there is no evidence that Van Winkle used or allowed anyone else to use the documents without proper consent. Van Winkle testified that she never used the documents. *Id.* at 189. None of the Company's witnesses testified to knowledge of Van Winkle using the information. *See, e.g.*, Doc. 62, Wilden Dep., at 131-33. Moreover, the Company subpoenaed Van Winkle's current employer, Sun Life, for the alleged trade secret documents and received nothing. *See* Doc. 41-1, Subpoena; Doc. 63, Plf.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., at 33. Finally, it is undisputed that Van Winkle has returned all documents to the Company.

Because Defendant HMIG is unable to prove misappropriation, Van Winkle is entitled to summary judgment on this counterclaim. Having so decided, the Court also declines to grant HMIG's request for injunctive relief.

### III. CONCLUSION

Therefore, having heard the parties and reviewed the record, and the Court being sufficiently advised,

**IT IS ORDERED** that:

(1) The motion for summary judgment by Plaintiff Jill Van Winkle (Doc. 41) be, and is hereby, **GRANTED,** and Defendant HMIG's counterclaims be, and are hereby, **DISMISSED WITH PREJUDICE**;

(2) The motion for summary judgment by Defendant HM Insurance Group (Doc. 44) be, and is hereby, **GRANTED IN PART AND DENIED IN PART**, and, with respect to all Defendants, Plaintiff's claims be, and are hereby, **DISMISSED WITH PREJUDICE**;

(3) A separate judgment shall enter concurrently herewith.

This 18th day of December, 2014



Signed By:
William O. Bertelsman
United States District Judge